## L. T. JOHNSON V. THE STATE.

No. 23820. Delivered January 7, 1948.

No attorney of record on appeal for appellant.

*Ernest S. Goens,* State's Attorney, of Austin, for the State.

HAWKINS, Presiding Judge.

Conviction is for robbery, punishment assessed at seven years in the penitentiary.

The victim of the alleged robbery was Herbert (Red) Johnson, hereinafter referred to as Red.

The testimony of Red, in substance, was: That on a Monday night appellant came to his (Red's) house and wanted him to take appellant to Thalia. Red declined to do this because his car was not in good running order. On the pretext of getting Red to show appellant a "short-cut" through the woods to one Giles' house appellant got Red away from his house, where several others were present, into the dark where they were alone, and then appellant struck Red on the head with a piece of two-by-four, rendering him unconscious. When he regained consciousness he discovered that $115.00 had been taken from his pocket. As a result of the blow on his head Red went to the hospital where he remained from Monday night until three o'clock Wednesday afternoon. The State introduced the following confession of appellant (formal parts are omitted) : "* * * On or about the 13th day of January, 1947, I went down to see 'Red' whom I have been told is Red Johnson, and asked him to take me to Thalia in his car and he said his car would not run, and then I got scared that he might have a dog and I picked up a scandlan and then I decided to rob 'Red' and I hit him with the scandlan and knocked him down and then I felt sorry for him, but I reached in his pocket and took out his money. He had $115.00 and a check for $4.00. I hid $106.00 in the lining of my overcoat pocket and this money was there when I was arrested and in about a week I told the sheriff where the money was and took it out and gave it to the sheriff. I did not feel very kind toward 'Red' because sometime before I robbed him, he was in a crap game where I was playing and I made an 'eight' and the other fellows who were fading me, said the dice was tilted and I shot again and come out on 'seven' and they took my money, and I continued to shoot the dice and in the game I lost $22.00. When I came out on the seven, it was also tilted just like it was on the eight, and they *cotended* they won and took my money. Red was fading me too, along with the other fellows when I said I made the 'eight'. I had the two by four hid under my coat when I went down there. I had on a brown suit when I went down there. The overcoat that I had the money in was not the one I had on when I robbed 'Red'. * * *"

On the trial appellant testified that on Sunday night before

the alleged robbery he engaged in a dice—"crap"—game with Red, Alonzo Crisp, and a party referred to as the "house man;" that he had $22.00 when he entered the game and lost $12.00 "fair and square," and ten dollars which "Red and the house man took away from me." The loss of the ten dollars, according to appellant, occurred as follows: He had a five dollar bet with the "house man" and a five dollar bet with Red that appellant would make a certain point; when he threw the dice he made the point, but Red and the others refused to concede that he had won because the dice were tilted or "cocked"; when he threw again they claimed he had lost although the dice were "cocked" the same way, and they took his ten dollars.

We quote from his testimony on direct examination, as follows:

"* * * They took my money that way. I was not willing for them to take my money. I would have been willing for them to have taken it if I had lost it fair and square. I lost $12.00 fair and square. I did not let them have my money willingly there, I protested them taking it. I said I wou'd have taken my money if I hadn't thought that he had a pistol at that time. 'Red' Johnson talked very rough about it. * * * After dark on Monday I went down to 'Red' Johnson's house to get him to take me out to my daddy's, or take me home. I picked up something on the way down there, I picked up a two-by-four (2 x 4) for protection against his dog and him. I did not know that 'Red' had a dog but I saw a lot of dogs over there. I have been bit by a dog and that scar is on me.

"If 'Red' had taken my money and I thought that he had a pistol the night before, I went back down there because I wasn't a coward. I didn't want him going around and talking about how he took my money like he went around there talking about a fellow that he went and beat up and made him call him 'Mr. Red.'

"After I got down there I asked 'Red' if he would take me home. He said, 'No, his car wasn't running good.' I then asked him in what direction did Giles Williams live. I wanted to attract his attention, as I knew any fool would see a man draw a 2 x 4 out from under his coat. Along about then 'Red' had his hand in his pocket like he had it on a pistol, the same way he had it the night he took my money.

"I then hit him with the 2 x 4 and I took his money. I did not know how much money was there and I meant to take only my

money, I just wanted my money, which was $20.00; that is what I lost in the game. In other words, 'Red' took the $10.00 of mine and the $10.00 I would have won in the game. I did not intend to keep the balance of the money that was in his pocket-book, I intended to keep what was originally mine or what I thought was originally mine. I meant to give the rest of it back to him; I didn't want his money, I only wanted mine. I did not know how much money was in there when I took it. I later gave the money to the Sheriff. The Sheriff didn't find that money, I told him where it was and gave it to him."

On cross-examination appellant testified as follows:

"* * * I had $5.00 and a nickel with the house man and I had $5.00 and a nickel with 'Red', but I lost that on the side, and this man was speaking when he had no right to speak. When I come out on the seven (7) the house man did not pick up his $5.00 and the nickel, but 'Red' picked up his, he was the first one to speak. Whenever I come out on that seven, or what they said was a seven, 'Red' did not pick up his $5.00 and the nickel; that is not the way it was. I did not keep on shooting. As to who picked up the $5.00 and the nickel, will state that 'Red' picked it up before I started to pick it up first. And then the house man picked up his. * * *"

It is clear from the evidence before us that for some reason appellant blamed Red for the loss of appellant's ten dollars, and intended to, and did take from him by the assault $20.00, that being the aggregate amount of the $5.00 of appellant's money which he had bet with Red and the $5.00 which he claimed he had won from Red, and also the $5.00 which appellant had bet the "house man". Appellant claimed that the excess over $20.00 was taken by mistake, and that he intended to return it to Red. After keeping it hidden in the lining of his overcoat for several days he finally got it out and delivered it to the sheriff, but never directed him to turn it over to Red.

We find nothing in the record which shows that the "house man" had turned over to Red the money the "house man" had taken from appellant, or that Red had any money belonging to the "house man," or that appellant had any reasonable ground for believing that Red was in possession of any such money.

Whatever may have been appellant's intent with reference to the excess taken over and above the $20.00, the evidence is conclusive that he took and intended to take by robbery from

Red $10.00, no part of which Red had taken or for which he was responsible.

Bill of exception number one is in question and answer form without any certification by the trial judge that it was necessary to be in such form. As thus presented the bill will not be considered. See authorities collated in Note 24, under Art. 667, Vernon's Tex. C. C. P.

Bill of exception number two complains at the refusal of a special charge requested by appellant. We quote from it, as follows:

"* * * There has been some testimony to the effect that the defendant herein and the prosecuting witness and others were engaged in a crap game the night before the alleged robbery and that the defendant was deprived unlawfully of money belonging to him in said game. Now, if you believe from the evidence, or entertain a reasonable doubt thereof that the defendant, L. T. Johnson was deprived unlawfully of his money in said crap game by Red Johnson and that defendant parted with his money under protest and not under the rules of the game, then in that event the defendant would not be guilty of robbery in retaking his money even by force. * * *"

The bill shows that counsel requested the court to prepare a charge of his own in the event the requested charge did not meet the court's approval.

We have not been favored with a brief from appellant's counsel, hence are not apprised of what particular authorities he relies upon. The question was considered in Cole v. State, 104 Tex. Cr. R. 533, 286 S. W. 204; Fisher v. State, 102 Tex. Cr. R. 229, 277 S. W. 386; Temple v. State, 86 Tex. Cr. R. 219, 215 S. W. 965; Carroll v. State, 42 Tex. Cr. R. 30, 57 S. W. 99; Carr v. State, 55 Tex. Cr. R. 352, 116 S. W. 591; Blain v. State, 34 Tex. Cr. R. 448. An examination of the cases cited appears to make accused's legal rights, as recognized by this court, turn upon whether he has voluntarily delivered money to the winner in a gambling transaction. However, we fail to find any case embracing one feature present in the one now before us, and in view of its presence here we can well understand the perplexity of counsel for appellant, as well as the trial judge, in attempting to formulate a defensive charge. As heretofore stated, appellant took and intended to take from Red $10.00 which had never been in his possession, to-wit: the $5.00 which appellant bet the "house man," and $5.00 which appellant claimed he won

from the "house man." He did not take this money by mistake, and never intended to return it. As we understand the record, regardless of the $10.00 appellant claimed Red had taken in violation of the rules of the game, and the excess over the $20.00 which appellant claimed he took by mistake, the fact remains that appellant robbed Red of $10.00 involved in appellant's bet with the "house man." In doing this appellant did not "rob Peter to pay Paul," but robbed "Peter" to pay appellant what he claimed "Paul" was due appellant.

We are not inclined to extend the rule regarding these gambling transactions beyond those limits already recognized.

Believing no error was committed in refusing the special requested charge under the circumstances here present, the judgment is affirmed.